## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 15-CV-02104-MSK-MEH

TIM DUNCAN,

     Plaintiff,

v.

CHARLES BANKS and GAMEDAY ENTERTAINMENT, LLC,

     Defendants.

---

## PLAINTIFF'S AMENDED COMPLAINT AFTER TRANSFER

---

Plaintiff Tim Duncan ("Duncan" or "Plaintiff") files this Amended Complaint after Transfer ("Amended Complaint") against Charles Banks ("Banks" or "Defendant Banks") and Gameday Entertainment, LLC ("Gameday" or "Defendant Gameday").

### I. PROCEDURAL BACKGROUND

1.     On January 29, 2015, Plaintiff filed an original petition in the 224th Judicial District Court of Bexar County, Texas against Banks. On February 26, 2015, Banks removed the case to the United States District Court for the Western District of Texas San Antonio Division. On June 10, 2015, Judge Xavier Rodriguez of the Western District of Texas San Antonio Division heard Banks' Motion to Compel Arbitration and in the Alternative Transfer Venue (W.D. Tex. Dkt. No. 14) (the "Motion"). On September 17, 2015, the court entered an order granting in part and denying in part the relief sought in the Motion. W.D. Tex. Dkt. No. 49. As part of the relief granted, Judge Rodriguez transferred that portion of the case relating to Gameday to this United States District Court for the District of Colorado. This Amended Complaint is filed pursuant to this Court's Courtroom Minutes/Minute Entry of March 28, 2016

by Magistrate Judge Michael E. Hegarty extending the deadline for amendment of pleadings and joinder of parties to May 9, 2016. Dkt. No. 68.

## II. PARTIES

2.     Plaintiff is an individual residing in San Antonio, Texas.

3.     Defendant Banks is an individual residing in Atlanta, Georgia. Banks made an appearance in the case filed in the Western District of Texas before that portion of the case relating to Gameday was transferred to this Court.

4.     Defendant Gameday is a Colorado company who can be served with process by serving its President, Jeff Neal, at 400 Quivas Street, Denver, Colorado 80204. Plaintiff's counsel has been advised that Gameday will waive service of citation and will enter an appearance in this action pursuant to such waiver.

## III. JURISDICTION AND VENUE

5.     The Court has subject matter jurisdiction over this action by reason of the parties' diversity of citizenship pursuant to 28 U.S.C. §1332(a)(1). The amount in controversy exceeds $75,000, excluding interest and costs. This Court has personal jurisdiction over Defendant Banks because Banks induced Duncan to invest in a Colorado company for his own personal benefit and because Banks conducted business, including but not limited to the transaction or transactions that are the subject matter of this lawsuit in this judicial district, as alleged in this Amended Complaint, or otherwise has sufficient contacts with the state. This Court has personal jurisdiction over Defendant Gameday because Gameday is a Colorado company, because Gameday consented to the jurisdiction of this Court as part of the transaction or transactions that are the subject of this action, and because Gameday conducted business, including but not limited to the transaction or transactions that are the subject matter of this lawsuit in this judicial

-2-

district, as alleged in this Amended Complaint, or otherwise has sufficient contacts with the state.

6.    Venue is proper in this judicial district pursuant to the Order of the United States District Court for the Western District of Texas transferring that portion of the case relating to Gameday to the United States District Court for the District of Colorado and pursuant to the venue provision in the Note and Warrant Purchase Agreement between Gameday and Plaintiff, which states as follows:

> EACH OF THE PARTIES HERETO EXPRESSLY WAIVES ANY AND ALL OBJECTIONS IT MAY HAVE TO VENUE IN STATE OR FEDERAL COURT RESIDING IN DENVER, COLORADO, INCLUDING, WITHOUT LIMITATION, THE INCONVENIENCE OF SUCH FORUM, IN ANY OF SUCH COURTS.

## IV. FACTUAL BACKGROUND - INTRODUCTION

7.    Duncan is a professional basketball player. He has played his entire professional career with the San Antonio Spurs of the National Basketball Association ("NBA").

8.    Banks is Duncan's former financial/investment advisor. Duncan met Banks, who was then the President of CSI Capital Management ("CSI") during Duncan's rookie year – in approximately 1997 – when Duncan was twenty-one years old. Banks and others pitched CSI to Duncan in 1997. They presented their investment philosophy as conservative to allow for slow and steady growth. Duncan agreed to engage CSI.

9.    Duncan entered into an Agreement—Financial Services with CSI in 1997 whereby Duncan "retain[ed] CSI to provide tax planning, financial advisory and investment counseling services," and "CSI agree[d] to perform such services for [Duncan]." This agreement remained in effect until April 1, 2000, when two new contracts were signed.

-3-

10. The first, entitled "Agreement—Investment Counseling" obligated CSI to "provide investment counseling services." The second, entitled "Business Management and Financial Services Agreement," covered CSI's obligation to provide other financial advisory services. Upon information and belief, these contracts were in effect until CSI was purchased by SunTrust Bank ("SunTrust") in 2011. Banks signed both of these contracts on behalf of CSI.

11. Banks was to act as Duncan's financial/investment advisor and was to be Duncan's main point of contact as Banks claimed he was primarily responsible for recruiting Duncan. Banks was a registered investment advisor at the time Duncan met him, and he continued his registration with the Securities and Exchange Commission ("SEC") until in or around 2011.

12. Duncan was (and still is) professionally committed to play pre-season games, approximately eighty-two regular season games, and post-season games – a commitment that requires substantial travel time. Duncan's life as a professional athlete presented challenges to personally managing his financial and investment affairs due, in part, to the logistics of coordinating paperwork, signatures, telephone calls, and conferences.

13. Duncan required an advisory team with a leader he could trust and rely on and, as the relationship evolved, Duncan came to believe he had just such a team leader in Banks. Duncan only dealt with Banks and his assistants at CSI. Duncan essentially gave control of his financial/investment affairs to Banks. Duncan had little interaction with his own finances as much of the day-to-day management was left to Banks and CSI.

14. Duncan reviewed his personal, financial goals with Banks and expected Banks to act in his best interest related to those goals. Banks, as an investment advisor, representative, and agent of CSI, owed a fiduciary obligation to Duncan. During Banks' time at CSI, CSI

-4-

invested Duncan according to CSI's conservative philosophy. CSI did invest Duncan in several private equity deals, but each was for a very small percentage of Duncan's total wealth.

15.    Banks left his position as President of CSI in 2007. By this time, Duncan was ten years into a successful NBA career and ten years into a trust relationship with Banks. Upon information and belief, Banks remained a shareholder of CSI until it was sold to SunTrust in 2011. Additionally, he was registered as an Investment Adviser Representative until September 27, 2011 according to an Investment Adviser Representative Public Disclosure Report.

16.    Banks' trust relationship with Duncan and his finances continued. Banks continued to solicit and advise Duncan to invest in private equity deals. By the summer of 2012, Banks had been Duncan's financial advisor for over fourteen years and had directed and/or overseen Duncan's investments in various deals, funds, and ventures.

### V. THE GAMEDAY INVESTMENT

17.    In May of 2012, Banks started promoting yet another investment to Duncan. The investment Banks was pitching was in Gameday.[1] The business in question was the sports/athletic merchandising business. Banks was the Chairman of Gameday.

18.    Banks first pitched the new opportunity to Duncan saying:

> I have a very good opportunity to run by you. . . . I have another
> deal for you to take very little risk yet make 10% spread for 3 years
> (400-700k per year net) and end up with equity in a $50 m
> company. Gameday Merchandising is the company (and we
> already own a big chunk of it...from the XP deal we did a few
> years ago. The company has grown like crazy . . . Basically the
> company would borrow $4-7m at 12% interest . . . . I see this as a

---

[1] In 2007, Banks had advised Duncan to invest $500,000 in a company called Gameday Partners. Gameday Partners is believed to have an ownership interest in Gameday.

#5095198.4

home run for you. . . . [T]he loan would be guaranteed and backed by the long term contracts we have with the Denver Broncos, Washington Nationals, NBA (including the All Star game for the next 5 years) OKC thunder, Warriors, Phoenix Suns and other teams…as well as inventory. Let me know if you are interested. This could fund your retirement for the next 3 years and then some!

19.     Despite his efforts, Duncan did not respond.  By the summer of 2012, Gameday was extremely tight on cash flow and was in need of additional funds to meet current and upcoming financial obligations, including a $6 million loan from Comerica Bank ("Comerica") that was coming due at the end of the year.  Banks emailed Duncan again in August:

You are a small investor in [Gameday Merchandising] and it is ROLLING[]. . . . Jeff Neal, the CEO wants to replace the $7m loan we have with Comerica bank and add another $3m of capital.  He just sent me the final offer from ahedge fund to provide $15m of financing.  I think its too much and want to see less debt (im conservative about debt).  Based on the deal he sent me I can get you a great deal (I cant do it because I am chairman).  If you loan the company $4-5m **(secured by our guaranteed contracts and inventory)** I can get you 12% interest (you can borrow from Suntrust for 2%) and I can get them to pay the interest up front each year.  This would be a 3 year loan and paid in full at the end of three years.  **So you would take very little risk (because of the security)** and make 1.2-1.5m over the three years.  And the company has the capital to grow to $60m in sales so we can [sell] it for $100m, making you another few million.….Anyway, this is the deal we have on the table with the hedge fund, so I know I can get it for you. [sic throughout, emphasis added][2]

20.     There were two investment vehicles being pitched: an approximately $4 million "bridge" loan from Duncan to Gameday and/or a $15 million mezzanine financing investment to be split between Duncan and unidentified European investors.  The bridge loan was to meet

---

[2] In the same email, Banks also pitched an investment in Métier Tribeca LLC d/b/a Le Métier de Beaute ("Le Métier").  The Le Métier investment is the subject of a claim in the Western District of Texas San Antonio Division.

#5095198.4

immediate cash needs pending the closing of the mezzanine financing transaction. Participation and funding by the European investors was critical to the mezzanine financing proposal.

21.     Banks and Gameday outlined how the investment proceeds were to be applied, namely: $6 million to pay off the Comerica loan; $1.9 million for inventory acquisition for various sports teams; and $1.5 million to pay off a guaranty, a bank creditor, and a contract with the Washington Nationals. The remaining balance – $5.6 million – was to be "working capital for business development."[3]

22.     The mezzanine investment was to be secured by a superior security interest in all of Gameday's assets including its inventory/fixed assets and guaranteed contracts once the bank loans were paid off. Banks assured Duncan his investment would be secured with a superior security interest in all of Gameday's assets.

23.     At this point, Banks was the only individual who was communicating with Duncan about this potential investment. Inquiries made by Gameday to contact Duncan directly were rejected by Banks.

24.     In September 2012, Banks and Gameday approached SunTrust about the investment.[4] Banks instructed Gameday to act like it was a "done deal" with Duncan. SunTrust was told by Gameday that based upon discussions with Banks, that the investment decision had already been made. Upon reviewing Gameday's proposal, SunTrust informed Banks that

---

[3] In a September 2012 "Mezzanine Debt/Equity Proposal," Gameday represented it would "payoff the Comerica and Bank of America Loans in full." The remaining funds were to be used as "working capital for ongoing operations and business development." The targets of the business development were: the Golden State Warriors; the Sacramento Kings; the Brooklyn Nets, the Colorado Rockies, and the Puerto Vallarta Celebrity Golf Invitational.

[4] At the time, Duncan had brokerage accounts with SunTrust, which were a potential source of funds for the mezzanine investment.

#5095198.4

"SunTrust doesn't want to do the deal since we have no assurances that the European group is coming in." At this point, no one from SunTrust had discussed the transaction with Duncan.

25. Gameday, at the time, was still short of cash and under the gun with Adidas who was threatening to pull its partnership deal on the Warriors and other deals because Gameday had been slow paying them, and they were not convinced that Gameday could acquire the Warriors' inventory. Gameday also had a $1 million line of credit with Comerica that was set to mature on October 31, 2012.

26. With SunTrust out, Banks turned to another lender: Comerica. Banks would get Gameday the cash it needed by having Duncan transfer $10 million from SunTrust to a Comerica money market account and then set up a $10 million line of credit with Comerica. Funds from the line of credit would be used to fund investments in both Gameday and Le Métier, mentioned above. The money market account would secure the line of credit.

27. Funding of the Duncan piece of the investment was not to take place until the funds from the European investors were received by Gameday. In fact, Banks told Gameday that Duncan was very worried that the Europeans were not real and that he was being misled into funding. Gameday was instructed not to fund Duncan's investment until the money from the European investors was in Gameday's account.

28. On or about October 25, 2012, Duncan and Gameday executed a Note and Warrant Purchase Agreement ("Purchase Agreement") for Seven Million, Five Hundred Thousand Dollars ($7,500,000.00) (the "Gameday Investment"). Section 2 of the Secured Promissory Note (attached as Exhibit A to the Purchase Agreement) (the "Gameday Note") states that

> Payer [Gameday Entertainment] shall make payment of accrued, unpaid interest on the 1st day of each month commencing on

-8-

December, 2012 until this Note is paid in full. . . . All payments shall be applied first to accrued interest, and thereafter to principal.

29.     Section 1 of the Security Agreement (attached as Exhibit C to the Purchase Agreement) states that:

> Pursuant to the Note . . . , Debtor [Gameday] grants Secured Party [Duncan] a security interest in Debtor's right, title and interest in and to the following property of Debtor, wherever located and whether now existing or hereafter arising or coming into existence (collectively, the "Collateral")
>
> > All assets of Debtor, wherever located, whether now owned or hereafter acquired or arising, and all proceeds, products, accessions, additions, substitutions and replacements thereof, including, without limitation, all inventory, equipment, fixtures, other goods, accounts, account receivables, contract rights, chattel paper (tangible and electronic), deposit accounts, documents, general intangibles, payment intangibles, software, instruments, investment property, intellectual property, letter-of-credit rights and letters of credit.

30.     The Gameday Note was to be a superior note that was not subordinated to any other Gameday indebtedness.  Payments on the Note were to be made with no provisions for deductions for advisory or any other fees.  The Warrant to Purchase Units (attached as Exhibit B to the Purchase Agreement) also affords Duncan an opportunity to purchase securities in Gameday.  These representations and promises, including the opportunity to purchase securities, induced Duncan to make the $7.5 million investment.

31.     On the same day, October 25, 2012, Banks advised Gameday that he needed to send [Duncan's] wire that day or "we [would] have to get him on the phone to approve, which could be tough."  Gameday was told not to touch Duncan's funds until the European funds were received.  Banks told Comerica to send $8.6 million from Duncan's account to fund the Le

-9-

Métier investment ($1.1 million) and the Gameday Investment ($7.5 million). Comerica completed the wire as instructed by Banks.

32.     The European investors never funded the other $7.5 million of the mezzanine financing. The $6 million Comerica loan to Gameday was never paid off – in fact to this date, it has not been paid off. And Duncan's funds were used, but not as represented. Rather, approximately $1 million was loaned by Gameday to Banks, its Chairman, and $1.5 million was loaned to Hammer Holdings, LLC, a company believed to be controlled by Banks and owned by Banks and NBA basketball player, Kevin Garnett.

33.     Despite Defendant's representation that "you would take very little risk (because of the security)" – and unbeknownst to Duncan – Duncan's security agreement was essentially worthless. Comerica's pre-existing, first secured interest in Gameday's inventory and assets was never extinguished because the $6 million Comerica loan was never paid off as promised. This fact only came to light during the family law proceeding in Bexar County, Texas when it was discovered that neither Gameday nor Banks had filed a UCC-1 recording Duncan's interest. Upon further investigation, it was eventually revealed that Comerica had a first secured and recorded interest in Gameday's inventory and assets since as early as 2010.

34.     Despite the absence of provisions in the Gameday Note, Banks abused his position as Duncan's financial advisor and instructed Gameday to withhold twenty percent (20%) of the interest payments due Duncan under the Gameday Note as Banks' "fee." However, Banks did not, and does not, have any written authorization from Duncan allowing such withholding.

35.     When confronted about the amounts withheld at Banks' instruction and for Banks' sole benefit, Banks stated that he would not return the wrongfully withheld payments to

-10-

Duncan unless Duncan executed an affidavit stating that Banks was <u>not</u> his financial or personal advisor and that Duncan fully and finally released Banks.

36.     Unfortunately, while Banks was willing to use his position with Gameday to secure payments for himself, he was not willing to ensure that Duncan's interests were protected. He allowed Gameday to use Duncan's funds before the European investment was funded. He failed to advise Duncan that other parties continued to hold security interests in Gameday that took priority over Duncan's interests (as the Comerica loan was not paid off). He failed to ensure that Duncan's security interest was promptly recorded. He instructed or allowed Gameday to record Duncan's interest as "equity" rather than "debt" on its balance sheet. And he failed to advise Duncan that Gameday may not be able to timely make the payments due under the Gameday Note.

## VI. THE GUARANTY AND SUBORDINATION AGREEMENT

37.     In addition to the above, Banks fraudulently obtained a Guaranty and Subordination Agreement in favor of Comerica and to the benefit of Comerica, Gameday, and himself. Prior to Plaintiff's Gameday Investment, Gameday had borrowed substantial sums from Comerica. In the spring and summer of 2013, Comerica and Gameday began discussions to re-finance Gameday's debt. As a condition to that re-financing, Comerica wanted personal guaranties of that debt. The guaranties were to come from Duncan, Kevin Garnett, and a Garnett Family Trust.

38.     The re-financing transaction also required that any security interest in Gameday's assets or inventory that Duncan held was to be subordinated to Comerica's security interests in the same collateral. There were numerous email exchanges between Banks and Comerica about the Guaranty and the Subordination Agreement.

-11-

39.     Duncan was not aware of the Guaranty and the Subordination Agreement and did not participate in the negotiations to re-finance Gameday's debt to Comerica.  In fact, while Banks was talking to Comerica's officers about Duncan personally guaranteeing Gameday's debt to Comerica, he was communicating with Duncan about an entirely different transaction.  Banks was asking Plaintiff to sign an amendment to the $7.5 million Gameday Investment under the pretense that Gameday was going to pay down $1.5 million on the Investment.

40.     The following is a timeline setting out those communications:

| GAMEDAY EMAILS RECEIVED PURSUANT TO THIRD-PARTY SUBPOENA ABOUT SUBORDINATION AND GUARANTY | TEXT MESSAGES BETWEEN BANKS AND DUNCAN ABOUT AMENDMENT TO GAMEDAY LOAN |
|---|---|
| **May 5, 2013**: Banks and Neal, Gameday's CEO, discuss in an email the possibility of getting Duncan to replace someone else on the guarantee [sic].  Banks says "I need to be careful asking as I don't want to make him nervous.  Ask Brandt [of Comerica] what he would need from Tim." | |
| **June 3, 2013**: Neal tells Banks, in an email that Brandt Daniels (Comerica) is working on getting "TD's guaranty document by tomorrow." | |

#5095198.4

| GAMEDAY EMAILS RECEIVED PURSUANT TO THIRD-PARTY SUBPOENA ABOUT SUBORDINATION AND GUARANTY | TEXT MESSAGES BETWEEN BANKS AND DUNCAN ABOUT AMENDMENT TO GAMEDAY LOAN |
|---|---|
| **June 4, 2013 (4:47 p.m.):** Daniels asks Banks "Is [Duncan] going to be okay with just signature pages for his portion or will he want the entire document?" Banks replies "Signature is fine. Send me full copies." Tr. of Hr'g at 3. | **June 4, 2013 (beginning at 9:47 p.m.)**<br><br>Banks: "On the good news front Gameday is crushing. We are changing your 7.5m loan to 6m. Paying down 1.5m. Sending you an amendment to the loan I need you send back when you get it. Turning out to be even better than I hoped."<br><br>Duncan: "Why are we changing the loan?? If its crushing should I get more of the company?? Or at least what was agreed upon? I'm confused."<br><br>Banks: "My fault for not explaining more clearly. Your exposure is going down but your upside remains and your monthly payments remain. This just removed 1.5m risk for you. All grEAT [sic] news. No downside."<br><br>Duncan: "Alright. Well I'm in Miami til Sunday. Can get and sign the papers on Monday or you can send em to the hotel if you need them sooner."<br><br>(Duncan was in Miami for games 1 and 2 of the NBA Finals on June 7, 2013 and June 9, 2013 respectively. Gameday did not pay down $1.5 million and the loan was not amended.) |
| **June 5, 2013 (11:34 a.m.)** Nate Croyle (Comerica) tells Banks "I will follow up with a secure email containing the signature pages for the personal guaranty and subordination agreement for Tim to sign." | |
| **June 5, 2013 (4:20 p.m.):** Banks asks Nate Croyle via email to send the guaranty signature pages to Penni Wasserman (his assistant) and that she will get them to Tim and have him sign and return. | |

| GAMEDAY EMAILS RECEIVED PURSUANT TO THIRD-PARTY SUBPOENA ABOUT SUBORDINATION AND GUARANTY | TEXT MESSAGES BETWEEN BANKS AND DUNCAN ABOUT AMENDMENT TO GAMEDAY LOAN |
|---|---|
| | **June 7, 2013 (after the first NBA Finals game which the Spurs won):** "Good start! Faxing Gameday doc to you today. Which hotel?" Duncan responds with a hotel and a fax number. Banks later tells Duncan that that the fax went through. |
| **June 10, 2013 (11:44 a.m.):** Email from Neal (Gameday) to Penni Wasserman asking "Any luck with getting TD's signatures on the guaranty documents?  Wasserman replies **(1:51 p.m.):** "I sent pages to him on Friday [**June 7, 2013**] but I have not received them back". | |
| **June 12, 2013 (11:11 a.m.):** Banks emails Jeff Neal and says that "Duncan signed and facing [sic] back today. Need to talk to you about the guarantee fee structure. You around later today?" | |

41.     The timeline shows that while Defendant was communicating with Plaintiff about the need to sign an amendment to the Gameday Investment, ostensibly to reduce Duncan's risk, he was having parallel communications with Gameday and Comerica about Duncan needing to sign a personal guaranty and subordination agreement, which has the exact opposite effect.[5] Plaintiff believes that Banks lied to him about an amendment to the Gameday Investment. Defendant never sent Plaintiff a signature page for an amendment to the Gameday Investment. Instead, Defendant sent signature pages prepared by Comerica that Banks used for the Guaranty and the Subordination Agreement. All of this occurred while Plaintiff was in Miami for

---

[5] Duncan has not seen an amendment to the Gameday Note that was supposedly created during or around the time of the 2013 NBA Finals.

-14-

Games 1 and 2 of the 2013 NBA Finals. Neither Banks nor Comerica ever sent Plaintiff the complete Guaranty or Subordination Agreement documents.[6]

42. Plaintiff did not learn that Comerica claimed to have a Guaranty or Subordination Agreement in its favor, purportedly signed by him, until 2014. In 2014, another Comerica officer, Dan Grady, called a representative of Plaintiff and asked for Plaintiff's 2013 financial statement. When Plaintiff's representative asked why Comerica needed the financial statement, Grady responded that it was a required term of the Guaranty and that someone had provided Plaintiff's financial statement to Comerica the year prior.

43. Plaintiff's representative further inquired as to who had previously complied and submitted Plaintiff's financial statements, but Grady was unable to determine who that person was. Plaintiff has denied and continues to deny that he knowingly agreed to guarantee any Gameday debt to Comerica. Plaintiff has denied and continues to deny that he knowingly agreed to subordinate the security interest he had in Gameday's assets to any security interest claimed by Comerica in that same collateral. Plaintiff first saw the Guaranty and Subordination Agreement in September of 2014.

44. Duncan did not receive any benefit from, and was never paid any consideration for the Guaranty and the Subordination Agreement. However, guarantee payments believed to be substantial have been paid to an entity of which Banks is a one-third (1/3) owner and managing partner. The entity is Hammer Holdings, LLC.

---

[6] Brandt Daniel asked Defendant in a June 4, 2013 email if he should send complete documents or just signature pages to Duncan. Defendant replied "signature is fine. send me full copies."

#5095198.4

## VII. GAMEDAY DEFAULT

45.     Gameday has failed to timely make the interest payments on the Gameday Note. Specifically, Gameday has not made any interest payments since December 8, 2015. Gameday has been notified of its failure to make the required interest payments. As of the date of this filing, Gameday has not cured its payment default. If Gameday fails to do so by May 14, 2016, the Gameday Note has been declared as accelerated, and all principal and unpaid accrued interest shall become due and payable.

46.     Gameday also agreed in Section 3(c) of the Security Agreement to "at all times keep the Collateral free from any adverse claims, liens, security interests, or encumbrances . . . ." Collateral is broadly defined in Section 1 of the Security Agreement as all of Gameday's assets. Gameday knew, at the time of signing the Security Agreement, that it had previously pledged the same Collateral to another secured party. Gameday's actions are in direct violation of Section 3(c) and therefore constitute an Event of Default under Section 6(c) of the Security Agreement. Pursuant to Section 7 of the Security Agreement, Duncan's remedies upon the occurrence of an Event of Default include declaring any and all liability secured immediately due and payable without demand or notice of any kind.

47.     Upon acceleration, Gameday will owe Duncan $7,500,000 for the unpaid, accelerated balance of the Gameday Note and over $372,000 in unpaid interest, which continues to accrue, and attorneys' fees.

48.     Gameday waived presentment and demand for payment and agreed to pay all costs of collection when incurred, including reasonable attorneys' fees, costs, and other expenses.

#5095198.4

## VIII. COUNT I: BREACH OF FIDUCIARY DUTY BY BANKS

49.     To the extent necessary or appropriate, the foregoing paragraphs are incorporated herein.

50.     Duncan and Banks had a formal fiduciary relationship pursuant to Banks' role as Duncan's securities broker and investment/financial advisor.

51.     Additionally, or alternatively, Duncan and Banks had an informal fiduciary relationship of trust and confidence by virtue of Banks' longstanding status as Duncan's personal and financial advisor and confidante. Banks knew or should have known that Duncan was relying on him in matters related to his financial investments.

52.     Whether formal or informal, Banks owed Duncan a fiduciary duty. That fiduciary duty extended to all investments that Banks solicited Duncan to make or about which he offered advice. Specifically for purposes of this lawsuit, Banks' fiduciary duty extended to all matters involving Gameday.

53.     As a fiduciary, Banks owed Duncan multiple duties, including:

   (a) The duty of loyalty and utmost good faith;

   (b) The duty of candor;

   (c) The duty to refrain from self-dealing;

   (d) The duty to act with the highest integrity;

   (e) The duty of fair and honest dealing; and

   (f) The duty of full disclosure.

54.     Banks breached these duties by failing to fully, fairly, and honestly disclose material information to Duncan before he made the Gameday Investment and executed signature pages purportedly binding him to the Guaranty and Subordination Agreement, including without limitation:

-17-

(a) that the European investors had not funded their investment in the mezzanine financing before Duncan's funds were wired to Gameday;

(b) that he directed Comerica to wire Duncan's investment in the mezzanine financing before the European investors had funded their investment;

(c) that the Duncan funds that Banks had wired to Gameday were being expended by Gameday before the European investors had funded their investment;

(d) that the Comerica and Bank of America loans that were to be paid off as part of the mezzanine financing were, in fact, not paid off;

(e) that Duncan's security interest would not be first;

(f) that Duncan's security interest would not and had not been recorded;

(g) that Banks was making loans to himself or his affiliated companies that were unrelated to Gameday and that would affect Duncan's investment.

(h) that Banks negotiated for Duncan to personally guarantee the Comerica-Gameday loan in the amount of $6 million;

(i) that Banks negotiated for Duncan to subordinate his security interest in Gameday's assets to Comerica's;

(j) that Banks was sending signature pages to a Guaranty and Subordination Agreement and not an amendment to the Gameday Investment;

(k) that Banks was taking fees that were not authorized or approved by Duncan.

55.     Duncan has suffered damages as a direct and proximate result of Banks' breach of his fiduciary duty, and Duncan will continue to suffer damages in the future. Duncan is entitled to recover the damages resulting from this breach. Duncan is also entitled to the imposition of a constructive trust on the proceeds, funds, or property obtained as a result of Banks' breach of his fiduciary duty to Duncan.

56.     Banks intended to gain benefits to which he was not entitled making his breach of his fiduciary duty to Duncan intentional and entitling Duncan to exemplary damages.

#5095198.4

## IX. COUNT II: COMMON LAW FRAUD BY BANKS AND GAMEDAY

57.     To the extent necessary or appropriate, the foregoing paragraphs are incorporated herein.

58.     As detailed above, in order to induce Duncan's investment in Gameday, Banks and Gameday engaged in a pattern of misrepresentations, misstatements, and omissions in order to enrich themselves at the expense of Duncan. Specifically, Banks and Gameday defrauded Duncan through a pattern of deliberate misrepresentations, omissions, and other misconduct, including those listed at Paragraph 54 (a)-(k) above. At all times relevant hereto, Banks was the acting Chairman of Gameday and was acting as Gameday's agent in securing the Gameday Investment, as well as the Guaranty and Subordination Agreement from Duncan.

59.     Banks and Gameday knew, or recklessly disregarded, that the material misrepresentations, misstatements, and omissions to Duncan were false when made. Moreover, each such misrepresentation or omission was material as to the quality of the investment that Banks and Gameday were recommending, and relevant to Duncan's decision to invest. Banks and Gameday made these material misrepresentations and omissions, or caused them to be made, with the intent that Duncan would rely on them in making his decision to invest in Gameday.

60.     By reasonably relying upon Defendants' misrepresentations and omissions, Duncan has suffered damages proximately caused by Defendants' fraud.

61.     Banks is also liable for, and Duncan is entitled to, punitive damages attributable to Defendant's reckless, willful, and wanton conduct.

## X. COUNT III: FRAUDULENT INDUCEMENT BY BANKS AND GAMEDAY

62.     To the extent necessary or appropriate, the foregoing paragraphs are incorporated herein.

-19-

63.     As detailed above, in order to deceive Duncan, Banks knowingly misrepresented the conditions to the funding of the Gameday Investment; the financial stability of Gameday; the quality and risk of the Investment; the individuals participating in the Investment, and those facts at Paragraph 54 (a)-(k) above. At all times relevant hereto, Banks was the acting Chairman of Gameday and was acting as Gameday's agent in securing the Gameday Investment, as well as the Guaranty and Subordination Agreement from Duncan.

64.     Duncan, reasonably relying on these misrepresentations, was induced to enter into the Gameday Investment and the Guaranty and Subordination Agreement. Duncan suffered damages proximately caused by Defendants' fraudulent inducement.

65.     Duncan is entitled to rescission of the Gameday Investment including the Purchase Agreement and all related Exhibits, a return from Banks of the $7.5 million he invested, rescission of the Guaranty and Subordination Agreement, and such other relief as this Court may deem proper.

## XI. COUNT IV:  VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER BY BANKS

66.     To the extent necessary or appropriate, the foregoing paragraphs are incorporated herein.

67.     As detailed more particularly above, Banks intentionally, carelessly, or recklessly misrepresented and omitted material facts in connection with the sale of securities to Duncan. Defendant's misrepresentations and omissions were intended to and did deceive Duncan, for the purpose of causing Duncan to invest in Gameday. These false and misleading statements and omissions of material fact, detailed more fully above, include those listed at Paragraph 54 (a)-(k) above.

-20-

68. Duncan reasonably relied on the Defendant's representations, in light of the Defendant's purported reputation in the investment community, past communications regarding investment goals and advice, and based on the representations Banks made about the Gameday Investment. At the time of the Investment, Duncan was unaware of the falsity of the material misrepresentations and omissions.

69. As a direct, proximate, and foreseeable consequence of Defendant's misrepresentations, nondisclosures, and omissions, Duncan invested in Gameday, which has caused Duncan damages.

## XII. COUNT V: VIOLATION OF THE INVESTMENT ADVISERS ACT OF 1940 BY BANKS

70. To the extent necessary or appropriate, the foregoing paragraphs are incorporated herein.

71. As detailed more particularly above, Banks knowingly defrauded Duncan in violation of Section 206 of the Investment Advisers Act of 1940.

72. The misstatements, misrepresentations, and omissions of material fact were a scheme and artifice to defraud Duncan; Banks engaged in a transaction, practice, or course of business which operated as a deceit or fraud upon Duncan; and/or by such conduct, engaged in acts, practices, or a course of business which was fraudulent, deceptive, or manipulative, all in violation of section 206 of the Act.

73. Banks failed to fully inform Duncan of all material facts, including, those facts listed at Paragraph 54 (a)-(k) above.

74. As a direct, proximate, and foreseeable consequence of Defendant's misrepresentations, nondisclosures, and omissions, Duncan invested in Gameday, which has caused Duncan damages.

-21-

### XIII. COUNT VI:  BREACH OF CONTRACT AS TO GAMEDAY

75.     Gameday has failed to timely make the interest payments on the Gameday Note. Specifically, Gameday has not made any interest payments since December 8, 2015.

76.     Despite agreeing to "at all times keep the Collateral free from any adverse claims, liens, security interests, or encumbrances," Gameday has failed to do so.

77.     As a direct and proximate result of Gameday's breach, Duncan has and will continue to suffer damages and is entitled to recover, upon acceleration, $7,500,000 for the unpaid, accelerated balance of the Gameday Note, and over $372,000 in unpaid interest and attorneys' fees.

### XIV. DAMAGES

78.     To the extent necessary or appropriate, the foregoing paragraphs are incorporated herein.

79.     As a direct and proximate result of Defendants' conduct and breaches, Duncan has and will continue to suffer damages and is entitled to recover his actual damages, attorneys' fees, pre- and post-judgement interest, and costs.

80.     Duncan seeks rescission of the Gameday Investment and a return from Banks and Gameday of the $7.5 million he invested as well as over $372,000 in unpaid interest, which continues to accrue, and attorneys' fees.  Duncan also seeks rescission of the Guaranty and Subordination Agreement and a return of all funds Banks received as a "guaranty fee."

81.     Duncan also seeks punitive damages in recognition of the knowing, willful, and wanton nature of the misconduct of Banks.

#5095198.4

Dated this 9th day of May, 2016.

Respectfully submitted,

/s/ Richard C. Danysh
Richard C. Danysh
richard.danysh@bracewelllaw.com
J. Tullos Wells
tullos.wells@ bracewelllaw.com
Michael D. Bernard
michael.bernard@ bracewelllaw.com
Jacqueline Garza-Rothrock
jacqueline.garza-rothrock@bracewelllaw.com
Bracewell LLP
300 Convent, Suite 1500
San Antonio, TX 78205
Telephone: 210-226-1166
Facsimile: 800-404-3970

Amy E. Parker
amy.parker@bracewelllaw.com
Bracewell LLP
711 Louisiana Street, Suite 2300
Houston, TX 77002
Telephone: 713-221-1119
Facsimile: 713-437-5319

Harold A. Haddon
hhaddon@hmflaw.com
Haddon, Morgan and Foreman, P.C.
150 East 10th Avenue
Denver, CO 80203
Telephone: 303-831-7364
Facsimile: 303-832-2628

ATTORNEYS FOR PLAINTIFF
TIM DUNCAN

#5095198.4

## Certificate of Service

I hereby certify that on May 9, 2016, I electronically filed the foregoing Plaintiff's Amended Complaint after Transfer with the Clerk of Court using the CM/ECF filing system, which will send notification of such filing to opposing counsel at the following email addresses:

jmilitello@lockelord.com
aarreola@lockelord.com
acastro@lockelord.com
pmalingagio@sheppardmullin.com
rmercado@sheppardmullin.com
dmccarty@sheppardmullin.com

/s/ Richard C. Danysh
Richard C. Danysh

#5095198.4